David LAIME and Jeanna Dodd *v.* STATE of Arkansas

CA CR 00–382                                    43 S.W.3d 216

Court of Appeals of Arkansas
Divisions IV and I
Opinion delivered May 2, 2001

*Hampton, Larkowski & Benca*, by: *Patrick J. Benca*, for appellant.

*Jeff Rosenzweig*, for appellant Jeanna Dodd.

*Mark Pryor*, Att'y Gen., by: *Misty Wilson Borkowski*, Ass't Att'y Gen., for appellee.

SAM BIRD, Judge. David Laime and Jeanna Dodd entered conditional pleas of guilty to charges of possession with intent to deliver a controlled substance and possession of drug paraphernalia in violation of Ark. Code Ann. §§ 5-64-401 and 5-64-403 (Supp. 1999). Acting pursuant to Ark. R. Crim. P. 24.3, both reserved the right to appeal the court's denial of their motions

to suppress evidence found pursuant to a search of the vehicle that they occupied.

Laime and Dodd have filed separate appeals, which have been consolidated. Although expressed in slightly different terms, Laime and Dodd assert the same four points on appeal, to wit: (1) that [Arkansas State Police] Trooper Ramsey lacked probable cause to stop the vehicle; (2) that Trooper Ramsey violated their Fourth Amendment rights by continuing to detain them after he had concluded his investigation for the alleged traffic violation; (3) that omissions of facts in Ramsey's affidavit for search warrant undermined his drug dog's reliability and amounted to a violation of *Franks v. Delaware,* 438 U.S. 154 (1978); and (4) that the search warrant was objectively unreasonable because of its finding that the invocation of Laime and Dodd's constitutional rights provided probable cause, and there was no basis for a nighttime search. Because we agree that Laime and Dodd's Fourth Amendment rights were violated by Trooper Ramsey's detaining them after he had determined that the Texas registration of their van was valid, we hold that the trial court should have granted their motions to suppress the evidence resulting from the search of the van and its contents. Therefore, we reverse and remand.

A detailed recitation of the facts is essential to an understanding of our decision. At the suppression hearing, Trooper Ramsey testified regarding a traffic stop of a van that Laime was driving and in which Dodd was a passenger. Ramsey testified that at approximately 6:00 p.m. on July 28, 1998, while patrolling with his drug dog, Moose, he observed the van pass two tractor-trailer trucks in the far-left lane of I-30 between Benton and Little Rock. Ramsey testified that his attention was drawn to the van because it was traveling about sixty miles per hour in an area where the speed limit for cars was seventy miles per hour. He said that he was following the van in his marked patrol car but that there were two other cars between his car and the van, and that he considered the van to be holding up traffic. Ramsey said that it took the van about a mile and a half to complete its pass of the trucks, that the van then moved into the right-hand lane, and that the two cars ahead of the patrol car proceeded on past the van. Ramsey said that when his patrol car caught up with the van, he could see that it had a Texas license plate and he could read the tag number. He said that he called Hot Springs to run a check on the van's registration, and that a report came back that there was no registration in Texas for the license plate on the van.

Ramsey said that he stopped the van, approached the driver, and asked to see his driver's license. He said that the driver initially gave him a Virginia identification card issued to David Laime, but that the driver then produced a Virginia driver's license. Ramsey said that, because he wondered why Laime had a Virginia driver's license and was driving a car with Texas tags, he asked Laime if he owned the van. Laime responded that the van belonged to a friend in Texas, that he was headed to Little Rock to meet some friends who were going to take him on to Washington, D.C., and that his passenger was going to drive the van back to Texas. Ramsey then asked to see registration and insurance papers on the van. He was given an insurance document issued to a Jeanna Dodd for a Subaru vehicle, not for the Dodge van that Laime was driving. Ramsey returned to his patrol car to run another check on the Texas license plate and again received a report that there was no registration information on file for that license number.

At that point, Ramsey went back to the van and asked Laime to come to the patrol car because Ramsey had some questions. He said that at the patrol car, Laime handed Ramsey registration papers issued in Texas for the license plate that was on the van. The papers showed that the van was registered to Jeanna Dodd at Fort Sam Houston, Texas. He said that from "just looking on their computer thing," the registration appeared to have been issued at 12:30 that afternoon.

Ramsey testified that he started explaining to Laime the reason for the stop, but that Laime kept "firing" questions at him and would not give him a chance to explain anything. Laime said that Ramsey knew that he was in a hurry because he was supposed to meet people in Little Rock for supper, but Laime could not remember the name of the restaurant. Ramsey asked Laime who the lady passenger in the van was, and Laime told him that it was his sister. At this point, Ramsey told Laime to remain in the patrol car while he talked to Dodd. Ramsey said that he did not think that he asked what her name was, but that she told him that Laime was her brother. She told Ramsey that Laime was from Washington and she was from Texas, that the van belonged to "some of their kinfolk or friends or whatever it was back in Texas," that she was dropping Laime off in Little Rock, that they were going to have supper with friends who were taking Laime on to Washington, that she could not remember the name of the restaurant or tell him the names of the friends, and that after supper she was returning to Texas.

Ramsey said that he "started putting two and two together" after he talked to Dodd, and that the stories were "kind of falling apart" in the following ways:

> They were going to meet these folks that they didn't know where they was going to meet. They was driving somebody else's van that they didn't know — she was going to drop him off and she was going to take the van back to Texas. Their stories were just not matching up.

Ramsey said that he decided at that point to run a criminal history check on Laime "to see if they had some kind of violation somewhere down the way." He said he received a report that Laime had "some kind of charge out of Florida, some kind out of maybe Virginia or somewhere up there on the east coast." Ramsey said he asked Laime if he had ever been arrested for anything and Laime responded that he had received a speeding ticket or some kind of a driving offense a couple of years ago, but that he could not remember what it was for. Ramsey stated that, while he was writing the citations, he asked Laime, "You're not one of them guys to be carrying dope down the highway or anything, do you?" Ramsey testified that he felt like Laime was evading the questions and that Laime was becoming hostile, so he called for backup from Troopers Kellum, Cook, and Scarbrough. Ramsey said that while he was waiting on the backup to arrive, he asked Laime if he would give consent for a search of the van and that Laime responded, "No."

Ramsey said that he then pulled out a consent-to-search form and asked Laime if he knew what it was, and Laime said, "You're not going to look." When Ramsey started filling out the top part of the consent-to-search form, Laime repeated, "You're not going to look." When Ramsey tried to read the consent-to-search form to him, Laime again told Ramsey, "You're not going to look." Ramsey stated that Laime's attitude changed from "irate" to "bad combative" when Ramsey tried to read the consent-to-search form. He said that Laime stated that he was a law student, that he knew his rights, that Ramsey was violating those constitutional rights, and that Laime was going to sue Ramsey.

Ramsey stated that he decided to go back and talk again with the passenger in the van, and that he learned for the first time, from her Texas driver's license, that she was Jeanna Dodd. He said that he questioned her about why she and Laime had told him that the van belonged to someone else when it was registered in her name. Ramsey said that he asked her if he could look through the van, and

she responded that it would not be a problem except that they were in a hurry to get to Little Rock so that Laime could make connections with the friends who were taking him to Washington.

Ramsey said that he then returned to the patrol car, where Laime demanded that he be released unless he was under arrest. At that point Ramsey said that he told Laime he was free to go. Ramsey met Laime at the front of the patrol car after they got out of it, and Ramsey said, "[B]efore that van goes anywhere, I'm going to run the dog around it." Ramsey testified that when Laime protested, Ramsey again told him that he was "free to leave. He can walk. He can run. He can crawl. He can do whatever he wants to do. But before the van goes anywhere I am going to run the dog around the van. That's it, cut and dried. That's what's going to happen." Ramsey said that he instructed Laime and Dodd to get out of the van and get back out of the way, and that Ramsey then "put [the dog] to work on the van."

Ramsey testified that the dog began at the left rear of the van and proceeded around it counter clockwise. He said that Moose "alerted" (a term he explained meant that the dog was indicating "the presence of controlled substance") in the vicinity of the right rear tire where he noticed that a sliding window on the van was open. Ramsey said that after proceeding along the passenger side of the van, Moose alerted at the point where the van's double doors met. They proceeded toward the passenger door, and Moose alerted at the point where the passenger door met the door post. They proceeded around the front of the van and down the driver side to the general vicinity of the left rear tire and one of the windows, where Moose alerted again. According to Ramsey, it was at about this time that the backup troopers arrived, and that he told Laime, "[W]e're going to look in the van" ... because "my dog's telling me that he smells the odor of drugs in your vehicle, . . . and we're fixing to take a quick look." Ramsey said that because Laime continued to protest the search of his van, one of the other officers took him away and placed him in another patrol unit.

Ramsey described the search that he conducted of the van, resulting in the discovery of "a little bit of green, brown-looking vegetable matter" that he believed to be marijuana in the pouch on the back of the driver seat, and also what he believed to be a marijuana seed in a pouch on the driver-side door. Ramsey said that he then advised Laime and Dodd that they were under arrest for possession of a controlled substance. He went back to the van and found a shotgun case and a pistol box. He opened the pistol

box and found it empty. He opened the shotgun case and found about twenty "glass bongs, pipes, things I've seen in my years of law enforcement used to smoke marijuana through, or hashish or any other drug." He opened the back door of the van and discovered what appeared to be two safes, one about two-feet square with a combination lock "like a key pad that goes on a telephone," and a smaller one about half the size of the first one, with a turn-dial combination lock. He said that he asked Laime and Dodd to open the safes, but they replied that they did not have the combinations. Dodd said that one of the safes might have some money in it, that the combination had been sent somewhere else, and that the safe could not be opened in transport.

Ramsey said that one of the other troopers set the large safe on the ground, and that he went to get Moose to see if he would alert. Moose alerted on both safes. Ramsey then told the other troopers that since they could not open the safes, they needed to put everything back into the van, call for a wrecker to transport it, and "get a search warrant for these safes." Ramsey said that when the troopers opened the door of the van to put the large safe back, the small safe fell out on the ground and "busted open." A visual examination revealed that it was empty.

Ramsey said that while Troopers Scarbrough and Cook waited for the wrecker to come for the van, he and Trooper Kellum separately transported Laime and Dodd to the Bryant Police Department. Thereafter, a nighttime search warrant was obtained for the van and its contents, resulting in the discovery that the larger safe contained LSD and drug paraphernalia.

*Whether Trooper Ramsey lacked probable cause
to stop the vehicle*

Laime and Dodd argue that Ramsey misapplied our "left-lane law" in concluding that their van, which was traveling over the minimum posted speed and below the maximum, was continuously obstructing traffic in the left lane. Arkansas Code Annotated section 27-51-301 (Supp. 1999) reads in pertinent part:

(a) Upon all roadways of sufficient width, a vehicle shall be driven upon the right half of the roadway, except as follows:

(1) When overtaking and passing another vehicle proceeding in the same direction under the rules governing that movement;

. . . .

(b) Motor vehicles shall not be operated continuously in the left lane of a multilane roadway whenever continuous operation in the left lane impedes the flow of other traffic.

■ ■ The relevant inquiry on appeal is whether the officer had probable cause to believe that the defendant was committing a traffic offense at the time of the initial stop. *Travis v. State*, 331 Ark. 7, 959 S.W.2d 32 (1998); *see Whren v. United States*, 116 S. Ct. 1769 (1996). Probable cause exists when the facts and circumstances within an officer's knowledge are sufficient to permit a person of reasonable caution to believe that an offense has been committed by the person suspected. *Travis v. State, id.* The question of whether the officer had probable cause to make a traffic stop does not depend upon whether the defendant is actually guilty of the violation that was the basis for the stop; all that is required is that the officer had probable cause to believe that a traffic violation had occurred. *Id.* (citing *Burris v. State*, 330 Ark. 66, 71, 954 S.W.2d 209 (1997)). In assessing the existence of probable cause, our review is liberal rather than strict. *Id.* (citing *Brunson v. State*, 327 Ark. 567, 940 S.W.2d 440 (1997)).

Appellants contend that Ramsey's inability to verify the license tag by radio could not have provided probable cause for the stop because he had decided to stop the van before he was able to read the tag. They also contend that the trooper's claim that the van impeded the flow of traffic was unreasonable: they note testimony that Laime used the left-hand lane for passing while maintaining a speed within the maximum and minimum limits, that he moved to the right-hand lane after passing, and that all of this took only about a mile and a half.

■ We need not address the issue regarding operation of the vehicle in the left lane because there was a separate reason for the traffic stop. As mentioned earlier, Trooper Ramsey testified that he noticed the Texas license plate when he pulled behind the van, and he then asked for a check on the tag and learned that there was no such registration. In *Travis v. State, id.*, our supreme court found probable cause for a traffic stop even though an officer acted upon

his erroneous belief that a Texas license plate must display an expiration sticker as is required for Arkansas tags under our state law. Similarly, Ramsey had probable cause to believe that driving a vehicle with an unregistered Texas license plate was a traffic violation. Thus, we hold that Trooper Ramsey had probable cause to stop the van in order to ascertain the validity of its registration.

*Whether Trooper Ramsey violated*
*Laime and Dodd's Fourth Amendment rights*
*by continuing to detain them after concluding*
*his investigation of the traffic violation*

Appellants note Ramsey's testimony that he decided to search their van after learning that the license was valid. They contend that at this point there was no reason to further detain the van or the passengers, and that they should have been free to go. We agree.

■ Given the lawfulness of the initial stop, the question is whether the resulting detention was "reasonably related in scope to the circumstances which justified the interference in the first place." *Burris v. State*, 330 Ark. 66, 954 S.W.2d 209 (1997) (quoting *Terry v. Ohio*, 392 U.S. 1 (1968)). On this issue, the case of *United States v. Beck*, 140 F. 3d 1129 (8th Cir. 1998), is instructive.

The *Beck* court reversed the trial court's denial of a motion to suppress evidence that had been seized when the defendant's rented Buick was searched after a valid traffic stop. Officer Joe Taylor of the Conway, Arkansas, Police Department made the stop and gave Beck a verbal warning for following another car too closely. Taylor told Beck that he was free to go, inquired whether he had any weapons or drugs, asked to conduct a quick search of the car, and, in Beck's presence, radioed a canine officer for assistance. Beck, who had remained in the car and had responded that he did not have weapons or drugs, asked what would happen if he refused to consent to the search. Taylor said that no search would occur, but that a drug dog would be led around the outside of the car. Beck refused to consent to the search. When the canine officer arrived, Taylor motioned him to get the dog out and instructed Beck to stand to the side of the car, which Beck did. The dog was led around the automobile, and it alerted to a rear passenger door on the passenger side. Taylor informed Beck of his *Miranda* rights, and Beck told the officers that he had an illegal substance in his briefcase. A search of the briefcase revealed a residue that later tested positive for methamphetamine. Beck was subsequently placed

under arrest, and a small amount of methamphetamine was found pursuant to a search of his person.

The *Beck* court found no reasonable, articulable suspicion before the search was conducted that Beck's car was carrying contraband or that other criminal activity may have been afoot. The court held that asking Beck to step from his motor vehicle in order to await a drug-dog sniff of his automobile, after the completion of a valid stop for a traffic violation, constituted a seizure within the purview of the Fourth Amendment. Citing *U. S. v. Terry, supra,* the court stated that Beck's renewed detention after completion of the initial traffic stop could occur only if events that had transpired during the stop gave rise to a reasonable suspicion that justified further detention, and it rejected the government's contention that reasonable suspicion for the renewed detention arose from seven circumstances. The seven factors were as follows: (1) Beck was driving a car rented by an absent third party; (2) the car was licensed in California; (3) there was fast-food trash on the passenger side floorboard; (4) there was no visible luggage in the passenger compartment of the automobile; (5) Beck exhibited a nervous demeanor; (6) Beck was traveling from a drug source state to a drug demand state; and (7) Officer Taylor did not believe Beck's explanation, given the number of employment opportunities that lay between California and North Carolina, that he was driving across the country to procure employment. *See Beck, supra.* The *Beck* court discussed each circumstance as consistent with innocence or as generating suspicion of criminal activity; it found that reasonable suspicion for Beck's renewed detention arose from none of the circumstances, individually or in combination.

The State argues that the facts of the present case support, more strongly than *Beck,* Officer Ramsey's reasonable suspicion (1) because Laime and Dodd were unable to say whom they were meeting for dinner and at what restaurant; (2) because Laime and Dodd both told Ramsey that the van was borrowed, while the registration papers for it showed Dodd to be its owner; (3) because Laime stated that he had a traffic violation, but he failed to reveal drug violations, disorderly conduct, and obstruction charges; (4) because, unlike in *Beck,* Dodd's consumption of food and drink was inconsistent with Laime's contention that appellants were meeting someone for dinner within fifteen minutes; and (5) because Laime's demeanor was irate, hostile, combative, demanding, disorderly, and belligerent.

■ As to the first factor, we find nothing about a driver's inability or unwillingness, during a traffic stop, to reveal to a state trooper with whom and where he is having dinner later that evening as giving rise to a suspicion that illegal activity has occurred, is occurring, or is about to occur.

■ The second factor alleged by the State to justify a basis for suspicion of criminal activity is the contrast between Laime's statement that the van was borrowed from a friend in Texas and the registration papers that showed Jeanna Dodd of Fort Sam Houston, Texas, to be the owner of the van. However, as already discussed, Ramsey testified that he had already made his decision to search the van before he ever talked to Dodd and before he had any knowledge that the owner of the van was, in fact, its passenger. Ramsey's only knowledge regarding ownership of the van at the time he made his decision to search it was that it was owned by a friend of Laime's who lived in Texas, and that the owner was a Texas woman named Jeanna Dodd.

■ Regarding the third factor, the State argues "that [Laime] did not reveal, although given the opportunity, that he been [sic] arrested in Florida for a drug violation and charged in Virginia for a drug violation, disorderly conduct and obstruction." The State's characterization of Laime's "opportunity" to reveal his past record is disingenuous. Even considered in the light most favorable to the State, the most we can discern from Trooper Ramsey's testimony regarding Laime's "opportunity" is that, while writing out a traffic citation, he asked Laime "if he'd ever been arrested or had any type of history," and Laime responded that he had received a "speeding ticket or some kind of driving offense a couple of years back." Considering that Ramsey's inquiry was made while he was writing out a citation during the course of a traffic stop relating to an offense of impeding traffic and to questions about the registration of the motor vehicle Laime was driving, it is not illogical that Laime would interpret Ramsey's inquiry as being limited to whether he had been arrested or had a history of other traffic offenses. We do not believe that Ramsey's ambiguous inquiry could have been reasonably viewed by Laime as presenting him with the "opportunity" to reveal his entire criminal history, particularly where, under these circumstances, Ramsey had no right to inquire about Laime's criminal history, and Laime had no obligation to reveal such information.

■ Regarding the fourth factor, we find nothing that is inconsistent with innocent behavior about a traveler's consumption of a snack shortly before dinner.

■ Finally, regarding Laime's demeanor, we note Ramsey's testimony that Laime would not give him a chance to explain anything, and that Laime was in a hurry to meet people in Little Rock to catch a ride to Washington, D.C. Just as the government's reliance on nervousness as a basis for reasonable suspicion must be treated with caution, *Beck, supra*, (citing *United States v. Fernandez*, 18 F.3d 874 (10th Cir. 1994)), we think that the State's reliance on Laime's escalating demeanor as a basis for reasonable suspicion is misplaced. We view Laime's demeanor — even if accurately described by Ramsey as irate, hostile, combative, demanding, and disorderly — as consistent with Laime's expressed need to get to Little Rock in short order and with his justifiable protests of his unreasonable detention by Ramsey. The State's brief refers to Ramsey's need for additional officers "out of concern for his own safety," but our review of the testimony to which the State refers reveals no such concern expressed by him.

■ In sum, the point at which the initial traffic stop was completed was when Laime gave Trooper Ramsey proper registration papers for the van. Under the circumstances of this case, Ramsey could not have formed a reasonable suspicion that criminal activity was afoot from knowing that the van was registered to someone in Texas named Jeanna Dodd, from Laime's failure to specify details about the trip or previous violations in other states, or from Laime's agitated and hostile behavior. Therefore, the renewed detention of the van, its driver, and its passenger exceeded the valid reason for the initial stop and violated the Fourth Amendment. The subsequent search of the vehicle was an unconstitutional search, and the drugs and drug paraphernalia discovered were fruit of the poisonous tree. The trial court's denial of appellants' motions to suppress should have been granted. In light of this holding, we need not address the third point, that omissions of facts in Ramsey's affidavit for search warrant undermined the drug dog's reliability and amounted to a *Franks* violation; or the fourth point, that the search warrant was objectively unreasonable and that there was no basis for a nighttime search.

Reversed and remanded.

HART, ROBBINS, and NEAL, JJ., agree.

GRIFFEN, J., concurs.

STROUD, C.J., dissents.

WENDELL L. GRIFFEN, Judge, concurring. I agree that Trooper Ramsey violated appellants' Fourth Amendment rights by detaining them after he determined that the Texas registration of Dodd's van was valid. However, I write separately to state in the clearest terms that assertion of one's constitutional rights, even if asserted with rudeness, does not automatically provide a police officer with reasonable suspicion to conduct a warrantless search. The United States Supreme Court has held that a suspect's mere assertion of constitutional rights cannot constitute the sole basis for establishing probable cause to conduct a search. *See Florida v. Bostick*, 501 U.S. 429 (1991). *See also United States v. Hyppolite*, 65 F.3d 1151 (4th Cir. 1995) (holding that the mere assertion of constitutional right to refuse consent to search does not supply probable cause to search), *cert. denied*, 517 U.S. 1162 (1996); *Snow v. State*, 84 Md. App. 243, 578 A.2d 816 (1990) (holding the driver's refusal to consent to search of automobile did not give rise to reasonable suspicion that vehicle contained narcotics).

In this case, after Ramsey determined that the registration on Dodd's van was valid, Ramsey then began questioning appellants regarding Dodd's identity and why they were traveling to Little Rock. When their answers did not satisfy Ramsey, he then produced a consent form and asked Laime if he knew what it was. Laime responded, "You're not going to look." Nonetheless, Ramsey proceeded to fill out the top part of the consent form and Laime repeated, "You're not going to look." Ramsey attempted to read the consent form to Laime, who for the third time stated, "You're not going to look." When Ramsey informed Laime that he was going to use the drug dog to sniff the van, Ramsey said that Laime "went ballistic" and responded, "You're not going to do it." He also said, "You are violating my constitutional rights. Either arrest me or let me go." Laime repeated these protests as Ramsey ran the drug dog around the van and when he conducted the search of the interior of the van.

Ramsey testified that Laime's attitude changed from "irate" to "bad combative" when he tried to read the consent form to him, and the State argues that appellant's escalating demeanor provided Ramsey with reasonable suspicion to conduct the warrantless search of the van. We have rejected this argument, noting that nervousness as a basis for reasonable suspicion must be treated with caution.

Laime's conduct was consistent with his expressed need to get to Little Rock in short order.

However, Laime's behavior was also consistent with a person who was forced to repeatedly assert his Fourth Amendment right to withhold his consent to have the vehicle searched without a warrant and whose right to do so was being violated. Laime had every right to withhold consent to a warrantless search of the vehicle. Ramsey had no warrant and lacked reasonable suspicion to effect a warrant-less search. He plainly was unjustified in insisting that Laime consent to a warrantless search.

Finally, I write to declare my profound disappointment and displeasure with regard to the cavalier, if not callous, disregard that Ramsey's conduct manifested for an individual's right to withhold consent from governmental infringement on his personal liberty and privacy. It has often been stated that the Fourth Amendment protects the right to be left alone. Laime repeatedly asserted that right during the encounter with Ramsey.

Moreover, one's frustration, resentment, or even anger in the face of the blatant disregard of the right to be left alone does not suggest criminal conduct. The police are sworn to protect life and liberty, including the liberty to say no to the police. Otherwise, the Fourth Amendment right to be free from unreasonable searches and seizures will mean only what police officers like Ramsey want. That is not liberty; it is the essence of a police state.

JOHN F. STROUD, JR., Chief Judge, dissenting. I agree with the majority that the police officer had probable cause to stop the van in order to ascertain the validity of its registration, and that, consequently, the initial stop was valid. I do not agree, however, that the officer's continued detention of the vehicle and its occupants exceeded the valid reason for the initial stop, thereby making the subsequent search unconstitutional. I therefore respect-fully dissent and would affirm the convictions.

When reviewing a trial court's ruling on a motion to suppress, we make an independent determination based on the totality of the circumstances and reverse only if the trial court's ruling was clearly against the preponderance of the evidence. *Embry v. State,* 70 Ark. App. 122, 15 S.W.3d 367 (2000). The majority relies upon *United States v. Beck,* 140 F.3d 1129 (8th Cir. 1998). I, too, find that *Beck* is instructive. As explained by the Eighth Circuit Court of Appeals:

During an investigative stop, officers may check for weapons and may take any additional steps "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley,* 469 U.S. 221, 235 (1985); *see also United States v. Dawdy,* 46 F.3d 1427, 1430 (8th Cir.) (holding that requests for identification of all occupants, explanation of presence in area, and warrant check was within reasonable scope of detention), *cert. denied,* 516 U.S. 872 (1995); *United States v. White,* 42 F.3d 457, 459 (8th Cir. 1994) (holding that request for license, destination, and purpose of trip within reasonable scope of detention); *United States v. Ramos,* 42 F.3d 1160, 1163 (8th Cir. 1994) (concluding that license and vehicle registration checks were reasonable), *cert. denied,* 514 U.S. 1134 (1995).

. . . .

Nonetheless, *unless [the police officer has] a reasonably articulable suspicion for believing that criminal activity was afoot,* continued detention of Beck became unreasonable after he had finished processing Beck's traffic violation. *See United States v. Mesa,* 62 F.3d 159, 162 (6th Cir. 1995) ("Once the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants *unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.*").

. . . .

Because the purposes of Officer Taylor's initial traffic stop of Beck had been completed by this point, Officer Taylor could not subsequently detain Beck *unless events that transpired during the traffic stop gave rise to reasonable suspicion to justify Officer Taylor's renewed detention of Beck.* . . . Thus, we must consider whether Officer Taylor had a reasonable, articulable suspicion that Beck's Buick was carrying contraband or that other criminal activity may have been afoot. . . . " 'Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances.' "

. . . .

This court has summarized the standards used to consider whether reasonable suspicion exists as follows:

The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." . . . In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. "[T]he totality of the circumstances — the whole picture — must be taken into account." . . . We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. . . . It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, . . .; however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which "describe a very broad category of predominantly innocent travelers."

140 F.3d at 1134-1136 (emphasis added) (citations omitted). Contrary to the conclusion reached by the majority in the instant case, I have concluded that, in viewing the totality of the circumstances, "something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention."

Here, when the officer checked the Texas license tags, they did not show that the car was registered, providing the basis for the initial stop. When he asked the driver, Laime, for his driver's license, Laime gave him an ID card from Virginia. The officer asked him why the van had Texas tags if he was from Virginia, and Laime told him that the van belonged to a friend in Texas. Laime also told him that he and the other occupant of the vehicle were heading to Little Rock to meet some friends for supper and that those friends were going to take him to Washington. He said that his female passenger [appellant Jeanna Dodd] would then take the van back to Texas.

The officer then asked for registration or insurance papers and he was given insurance papers made out to "Jeanna Dodd" with a "Subaru" listed as the insured vehicle rather than the Dodge van that Laime was driving. At that point the officer did not know who "Jeanna Dodd" was. The officer then went back to his patrol car to check the Virginia ID and to run the Texas tags again. The tags still came back with no registration information.

The officer then went back to the van and asked the driver, Laime, to return to the patrol car with him because he had some questions. When Laime came to the patrol car, he had the Texas registration papers on the van. Those papers showed that the van was registered to "Jeanna Dodd," the same name shown on the insurance papers. The papers showed that the van had been registered in Ft. Sam Houston at 12:30 p.m. that afternoon.

It is at this point that the majority maintains the detention should have ended, whereas I think the officer's suspicions were still reasonable because the computer was not showing the car as registered, and it would be implausible if not impossible to register a vehicle at Ft. Sam Houston/San Antonio, Texas, at 12:30 p.m. and be near Benton, Arkansas before 6:00 p.m. on the same afternoon. He produced nothing but registration papers and insurance papers in the name of a person, "Jeanna Dodd," that was not the driver and that had not yet been identified as the female passenger.

Moreover, when the officer asked Laime where they were going to eat, he responded that he could not remember the name, but that his sister would know. The officer then went to talk to the female passenger. She also stated that they were brother and sister, that she lived in Texas and he in Washington, and that they were going to Little Rock to eat supper with friends that were going to take him back to Washington. When the officer asked her where they were going to eat, "She couldn't remember the address or whether it was Arby's or Wendy's or any other place like that." Neither could she tell him the names of the people they were to meet. I think the officer's continued suspicions remained reasonable at this point as well.

The officer then returned to his patrol car to talk to Laime and to have Hot Springs run a criminal-history check on him. He asked Laime if he had any arrests and Laime responded that he had a driving offense a couple of years ago. The officer described Laime as becoming irate, combative, and hostile, and that at some point he called for other officers. The officer then returned to the van to talk to the passenger [Dodd] again. He asked her for identification, and it was at that point that he learned that she was "Jeanna Dodd," the person in whose name the van was registered. Yet both she and Laime had previously told him that the van belonged to a friend in Texas.

In short, I find that these facts are distinguishable from those presented in *Beck, supra*. Laime and Dodd both seemed to be trying

to avoid full identification of themselves and the ownership of the vehicle, neither could remember where they were meeting the people in Little Rock, and Dodd could not remember the names of the people they were meeting. Based on the totality of these circumstances, I think the officer had sufficient reasons for further detaining appellants even after being furnished Texas registration papers. Consequently, I would find that the trial court's denial of the motion to suppress was not clearly erroneous.

The majority opinion does not address the remaining points of appeal, and neither do I, other than to say that I do not find reversible error with respect to either of them.